**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **JAMILLAH A. TRAINER**, | **CIVIL ACTION** |
| Plaintiff, |  |
| *v.* | **NO. 23-1940-KSM** |
| **COUNTY OF DELAWARE**, |  |
| Defendant. |  |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                                            **June 3, 2024**

Before the Court is Defendant County of Delaware's (the "County") motion for partial summary judgment in this employment discrimination suit.  (Doc. No. 17.)  Plaintiff Jamillah A. Trainer opposes the motion.  (Doc. Nos. 24, 25.)  For the reasons that follow, the Court grants the County's motion.

**I.      Background**

Plaintiff Trainer began working as a correctional officer at George W. Hill Correctional Facility ("the Facility") in March 2006.  (Doc. No. 17-5 at 10:20–11:2.)  From November 2020 to March 2022, Plaintiff took a leave of absence.  (*Id.* at 41:21–25.)  During this period from 2006 to 2022, the Facility was operated by the GEO Group, Inc. ("GEO").  (Doc. No. 24-2 at ¶ 2.)

Plaintiff returned to work on March 16, 2022.  (*See* Doc. No. 17-18 at 1.)  At the time, the County was preparing to take over operations of the Facility from GEO, and Laura Williams had been named as Warden of the Facility.  (Doc. No. 24-2 at ¶ 7.)  The County informed the

1

correctional officers employed by GEO that they would be permitted to apply for employment with the County if they were currently full-duty, active employees, even if they became full-duty after April 6, 2022, when the County officially took over operations.  (*Id.* at ¶¶ 10, 11.)

Plaintiff subsequently applied for a position with the County and was initially interviewed by a third party hired by the County to assist in the interview process.  (*Id.* at ¶ 46.) Then on March 17, 2022, Plaintiff was interviewed in person by George Rhoades, "a highly qualified" retired captain who had extensive interview experience.[1]  (*Id.* at ¶ 47; Doc. No. 17-18 at 1; Doc. No. 17-9 at 28:9–23.)

In conducting Plaintiff's interview, Rhoades used standardized interview questions, developed in advance by Warden Williams and recorded Plaintiff's answers on the interview form.  (Doc. No. 24-2 at ¶¶ 17, 48; Doc. No. 26-2 at 17:13–21.)  As with every other candidate, after completing the interview, Rhoades used his professional judgment to provide a recommendation as to whether Plaintiff should be offered a position of employment.  (Doc. No. 26-2 at 20:16–21:8; *see* Doc. No. 17-9 at 31:23–32:1 (Warden Williams testifying "[the interviewers] all knew at that time the direction, mission, values of the agency moving forward and were told to evaluate each candidate independently and utilize their judgment").)  After receiving each candidate's completed interview form with Rhoades's recommendation, Warden Williams made the final determination as to whether an applicant would be offered continued employment with the County.[2]  (Doc. No. 17-9 at 18:23–19:14.)

---

[1] Warden Williams selected Rhoades as an interviewer due, in part, to his experience conducting numerous interviews throughout his professional career.  (Doc. No. 24-2 at ¶ 13.)

[2] Warden Williams testified that her hiring decisions in theory were subject to approval of the County's Human Resources Manager, Budget Director and the Chair of the Jail Oversight Board.  (Doc. No. 17-9 at 18:23–20:20.)

During Plaintiff's interview, Rhoades asked, among other things, about Plaintiff's employment history and why she applied for the correctional officer position. (Doc. No. 17-18 at 1.) The two also discussed Plaintiff's recent leave of absence. (*Id.*) Plaintiff avers that she explained to Rhoades that she had been on a leave of absence due to medical reasons (Doc. No. 17-5 at 57:24–58:4), but Rhoades maintains that Plaintiff stated only that she was on leave for "personal reasons," and that he did not probe for any further details (Doc. No. 26-2 at 33:18– 35:18). Rhoades's interview notes state, "GWHCF 3/2006 to present. 11/2020 went out on leave due to personal issues came back 3/16/22."[3] (Doc. No. 17-18 at 1; *see also* Doc. No. 26-2 at 37:24–25 (Rhoades testifying, "Under oath, [Plaintiff] never mentioned medical leave – ever").) Although Plaintiff testified that Rhoades told her that he planned to recommend that she be offered a position (Doc. No. 17-5 at 58:4–19), Rhoades testified to the contrary and his interview notes record a recommendation that she not be hired, with the comment, "[c]ommitted years of service, not meeting expectations for forward direction of institution." (Doc. No. 26-2 at 38:5– 39:23; Doc. No. 17-18 at 3). Warden Williams ultimately agreed with Rhoades's recommendation not to hire Plaintiff. (Doc. No. 17-18 at 3 (Warden Williams's annotation below Rhoades's recommendation to not hire, "Agree. Do not hire"); Doc. No. 17-9 at 59:3–7; Doc. No. 17-14 at ¶ 21.)

On April 5, 2022, Plaintiff had an in-person meeting with Iris Wiley, then-Human Resource Manager for the Facility; Dele Faly, Facility Deputy Warden; and Mario Colucci, then-GEO Deputy Warden. (Doc. No. 24-2 at ¶ 61.) Plaintiff was given a letter informing her that

---

[3] Rhoades's interview notes also state, "HR Approved. -*Sent HR email June of 2021 to return, no response. * Sent another 3/4/22." (Doc. No. 17-18 at 2.) Plaintiff testified during her deposition that the Facility's then-GEO Human Resource representatives were inappropriately "stopping" her from returning to work. (Doc. No. 17-5 at 23:16–24:11; 45:4–19.)

Warden Williams was not offering her a position for continued employment with the County.[4]
(*Id.*)  Warden Williams testified that it was their practice to have both a County and GEO
representative present on the final date of the GEO employment contract and that then-Deputy
Warden Colucci was present at the meeting as a witness.[5]  (*Id.* at ¶ 62; Doc. No. 17-9 at 87:10–
25; Doc. No. 17-14 at ¶ 24.)  Colucci otherwise did not participate in Plaintiff's interview
process—he did not conduct any interviews, and Warden Williams testified that he had no input
in whether or not to extend an offer of employment to Plaintiff.  (Doc. No. 17-9 at 67:17–20;
Doc. No. 17-6 at 36:20–37:6 (Deputy Warden for Operations and Administration testifying that
"[t]o the best of my knowledge, Mario Colucci didn't have any involvement in the interview
process"); Doc. No. 17-10 at 39:3–5 (Union Vice President testifying that he was not aware of
anyone who was interviewed by Colucci).)[6]  No one at the County in human resources,
management, or administration told Plaintiff that Colucci was involved in the decision not to hire
her.  (Doc. No. 24-2 at ¶ 59.)  After Plaintiff read the letter informing her of the Warden's

---

[4] There is evidence in the record that the County had a limited review process for applicants who wished
to discuss why they were not selected for employment.  (*See* Doc. No. 17-20 at 1 (Dele Faly email memo
stating that then-HR Manager Wiley explained to Plaintiff that if she has any questions regarding her
hiring disposition letter, she can "provide them in writing and someone will response (sic) back to her");
Doc. No. 24-3 at 2 (handwritten note by Warden Williams on an applicant's no-hire disposition letter
stating, "Afforded opportunity for discussion – she asked if the exact reason [for not hiring] was cited in
her letter.  Informed she could follow up with HR and this request will be reviewed").)

[5] Again, Plaintiff's opposition to this undisputed fact merely states, "there was no legitimate reason for
Mr. Colucci to attend the April 5, 2022 meeting," without pointing to any evidence in the record to
support this assertion.  (Doc. No. 24-2 at ¶ 62.)  Because the Court cannot discern any proper evidence to
the contrary, the Court accepts this justification for Colucci's presence as undisputed fact.

[6] The president of the Delaware County Employees Independent Union (the "Union") testified during his
deposition that he "believe[s] Colucci was an integral part" of the hiring decisions for the County.  (Doc.
No. 17-11 at 66:1–4.)  However, despite repeated prompts to provide evidence supporting this belief, the
Union president was unable to demonstrate any personal knowledge to substantiate his speculation aside
from Colucci's attendance as a witness at the meetings where rejected applicants were given their hiring
disposition letters.  (*See, e.g.*, *id.* at 66:23–67:2 ("Q: . . . did anyone ever tell you from the County that
Mr. Colucci was the one making the decision?  A: They won't tell you that, but he was behind it.").)

decision, she turned to Colucci, accused him of being racist, and claimed that he was the reason she was not retained by the County for employment.  (*See* Doc. No. 17-20 at 1–4.)

During Plaintiff's deposition, she alleged that Colucci was historically a racist individual, and claimed that he inappropriately influenced Rhoades not to hire Plaintiff.  (*See, e.g.*, Doc. No. 17-5 at 27:2–7, 84:1–9; Doc. No. 25 at 8–9.)  She alleged that "based on the extensive interactions between Mr. Colucci and Mr. Rhoades, . . . Mr. Colucci influenced Mr. Rhoades to reverse his stated intention to her to recommend that she be offered employment with defendant, and instead recommend that she not be offered employment."  (Doc. No. 24-2 at ¶ 58.) However, Rhoades testified that he had no interaction with Colucci in connection with the interviews he conducted for correctional officer candidates.  (Doc. No. 26-2 at 42:19–22.) Rhoades understood Colucci was present as a witness during the meetings where applicants were informed of the Warden's hiring decision, but explained that Colucci had no role in the decision whether to hire an applicant.  (*Id.* at 42:23–43:19.)  There is no evidence in the record to suggest that Colucci was involved in the decision not to offer Plaintiff employment and no evidence of Colucci's alleged "influencing" of Rhoades.[7]  (*See* Doc. No. 17-9 at 68:19–20 (Warden Williams testifying, "Mr. Colucci did not have any decision making in the hiring determination.").)

After the County concluded its hiring, the County's employees consisted of 84.49% black correctional officers, and 80.87% black employees when considering the combined group of

---

[7] Plaintiff also claims that Colucci possessed a "no-hire" list of employees who he planned to recommend should not be hired.  (Doc. No. 24-2 at ¶ 66.)  Plaintiff does not offer any tangible evidence of this list aside from a blurry photograph of Colucci holding a non-descript notebook.  (Doc. No. 17-21.)  Plaintiff does not allege that she saw any of the names on the list, or that she saw her own name on the list.  (Doc. No. 17-5 at 28:9–29:5.)  Other witnesses, including the Union president and vice president, testified that they had seen Colucci in possession of a "no-hire" list, but stated their understanding that the list was compiled based on allegations of bringing contraband into the Facility.  (Doc. No. 17-10 at 40:3–19; Doc. No. 17-11 at 46:17–47:3.)  Neither witness testified that they had seen Plaintiff's name on the list (*see* Doc. No. 17-10 at 41:21–23), and neither testified that they had any personal knowledge that Warden Williams considered such list in her final hiring determinations.

correctional officers, sergeants, and lieutenants.  (Doc. No. 17-23.)  The County also hired three

white men who had been absent for an extended period of time:  Robert Cullen as a correctional

officer, and John Omelchuk and Zach Serody as sergeants.  (Doc. No. 24-2 at ¶¶ 34, 39; Doc.

No. 17-5 at 13:21–14:5; 46:9–12; Doc. No. 17-10 at 58:24–60:20.)  Although these candidates

had been on extended leave, the length of their leaves of absence were not identified during their

interviews.  (Doc. No. 24-2 at ¶¶ 35, 37, 38.)  Warden Williams testified that she had never

learned the length of each individual's leave.  (Doc. No. 17-14 at ¶ 5; Doc. No. 17-9 at 73:17–22;

74:4–18; 76:4–9; 76:20–77:8.)  The County did not have access to the personnel files previously

maintained by GEO's human resources.[8]  (Doc. No. 24-2 at ¶ 5; Doc. No. 17-9 at 31:21–32:6

(Warden Williams testifying that the County did not have access to GEO records); Doc. No. 17-

14 at ¶ 5.)

Plaintiff filed her complaint in this matter on May 5, 2023, alleging (1) a failure to make

reasonable accommodations under the Americans With Disabilities Act ("ADA"), 42 U.S.C.

§ 12101, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951,

(2) disability discrimination under the ADA and the PHRA, (3) race discrimination under Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000, and the PHRA, and

(4) unlawful retaliation under Title VII and the PHRA.  (Doc. No. 1.)  The County filed a motion

for partial summary judgment, seeking to dismiss all claims except Plaintiff's disability

discrimination claims under the ADA and PHRA.  (Doc. No. 17.)

---

[8] Plaintiff does not admit or deny Defendant's inclusion of this as an undisputed fact and instead states:
"After reasonable investigation, Ms. Trainer does not possess knowledge or information sufficient to form
a belief as to the truth" of this fact.  (Doc. No. 24-2 at ¶ 5.)  Because Plaintiff fails to counter this fact, the
Court accepts this as undisputed.  *See Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490,
493 (E.D. Pa. 2010) (noting that "unsupported assertions, conclusory allegations or mere suspicions" are
insufficient to overcome a motion for summary judgment).

Plaintiff agrees that she will not pursue her failure to accommodate claims under the ADA and the PHRA or her retaliation claims under Title VII and the PHRA.[9]  (Doc. No. 25 at 1.)  The Court therefore grants Defendant's motion for summary judgment on these claims. *Cf. McCarthy v. Int'l Ass'n of Machinists & Aero. Workers*, No. 21-1673, 2021 WL 5766569, at *2 n.3 (3d Cir. Dec. 6, 2021) ("Plaintiffs abandoned their claims under the LMRA [. . .] by omitting any reference to them in their opposition to Defendant's motion for summary judgment."); *McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 193 (E.D. Pa. 2022) (collecting cases supporting the proposition that a plaintiff's failure to address the substance of particular claims in opposition to a motion for summary judgment constitutes abandonment of those causes of action); *Laymon v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 458 (W.D. Pa. 2022) ("Plaintiff's failure to respond substantively to Defendant's Motion for Summary Judgment on the hostile work environment claim amounts to an abandonment those claims, and the entry of summary judgment as to those claims is appropriate.").  This leaves only Plaintiff's race discrimination claims under Title VII and the PHRA for the Court's consideration.

## II.    Legal Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

---

[9] Plaintiff's response states, "Ms. Trainer is not pursuing [. . . ] retaliation claims under Title VII and the ADA."  (Doc. No. 25 at 1.)  Plaintiff's original complaint did not include a retaliation claim under the ADA, but it did include a retaliation claim under the PHRA.  (*See* Doc. No. 1 at ¶¶ 27–30, 35–38.)  Because Plaintiff does not raise any argument related to retaliation under the ADA in her opposition to the motion for summary judgment (*see generally* Doc. No. 25), the Court infers that Plaintiff intended to state that she does not intend to pursue retaliation claims under Title VII and the *PHRA*.

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "While we view the evidence in the light most favorable to the non-movant, we are not required to take into account evidence that would not be admissible at trial." *Rosati v. Colello*, 94 F. Supp. 3d 704, 715 (E.D. Pa. 2015) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 296–97 (3d Cir. 2014)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).  "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar*, 732 F. Supp. 2d at 493.  Summary judgment must be granted "if

the evidence [. . .] is too speculative to establish any material issue of fact." *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 94 (3d Cir. 1985).

### III.    Analysis

The sole question before the Court is whether to grant the County's motion for summary judgment as to Plaintiff's claims of race discrimination under Title VII and the PHRA.

These claims are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Analysis under this framework proceeds in three steps. *Opsatnik v. Norfolk S. Co.*, 335 F. App'x 220, 222 (3d Cir. 2009). "First, the plaintiff must establish a prima facie case of discrimination." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). To establish a prima facie case of disparate treatment, a plaintiff must show that: (1) she is a member of a protected class, (2) she was qualified for her position, and (3) she suffered an adverse employment action, (4) under circumstances giving rise to an inference of intentional discrimination. *Id.* at 410–11; *see also Wallace v. Federated Dep't Stores, Inc.*, 214 F. App'x 142, 144–45 (3d Cir. 2007) (framing the fourth element as requiring evidence that "either similarly-situated non-members of the protected class were treated more favorably or the adverse job action occurred under circumstances that give rise to an inference of discrimination").

If the plaintiff carries her burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Jones*, 198 F.3d at 410–11 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248

(1981)).  To demonstrate pretext, a plaintiff must point "to some evidence, direct or circumstantial, from which a factfinder would reasonably either:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Id*. at 412–13 (quoting *Fuentes v. Perski*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Here, the County argues that Plaintiff does not have evidence to support her belief that race was the reason behind the County's decision not to hire her, asserting that her claim is "unsubstantiated and speculative."  (Doc. No. 17 at 9.)  The County argues that Plaintiff has not set forth a prima facie case of race discrimination, but even if she had, the County has articulated a legitimate, nondiscriminatory reason for not hiring Plaintiff—that she had missed a significant amount of time with GEO and the County was facing potential staffing concerns—and Plaintiff fails to establish that this was merely pretext.  (*Id.*)  Plaintiff conversely argues that the County fails to provide a legitimate non-discriminatory reason for not selecting Ms. Trainer, and that there is "ample evidence" to establish a genuine issue of material fact regarding whether the circumstances surrounding her non-selection establish pretext.  (Doc. No. 25 at 7.)

The Court need not address whether Plaintiff successfully established a prima facie case of race discrimination[10], because even if she had, the County established a legitimate,

_____

[10] The Court notes that although the County agrees that Plaintiff satisfied the first three prongs of her prima facie case, the County submits that Plaintiff failed to establish the fourth prong—that the circumstances give rise to an inference of intentional discrimination.  (Doc. No. 17-1 at 11.)  However, the County's brief on the motion for summary judgment does not elaborate on why they believe Plaintiff

nondiscriminatory purpose for not hiring Plaintiff, and Plaintiff fails to demonstrate that the County's stated reason was pretextual.

### A.  Legitimate, Nondiscriminatory Reason

The Court agrees that the County has articulated a legitimate, nondiscriminatory reason for not hiring Plaintiff.  The County states that Plaintiff was not hired because she had missed a significant amount of time with GEO and because the County faced potential staffing concerns with correctional officers who were unavailable to work.  (Doc. No. 17-1 at 11.)  Plaintiff raises three arguments to the contrary.  First, Plaintiff argues that this is not a legitimate, non-discriminatory reason because "significant amount of time" is a "nebulous, undefined term" and is "entirely subjective."  (Doc. No. 25 at 7.)  Second, Plaintiff argues that she was out on protected leave during this period, and that Warden Williams "admitted that such a reason for an extended period of time out from work cannot be relied upon as a reason not to hire an applicant."  (*Id.* at 8.)  Third, Plaintiff argues that the fact that she had been on leave for an extended period with the previous employer does not mean that she will not be available to work for a *future* employer.  (*Id.*)  The Court addresses each argument in turn.

First, although it may be true that the phrase "significant amount of time" does not have a specific definition, the Court finds that the County could consider a 15-month leave of absence— over one full calendar year—to be a "significant amount of time."  *See Fuentes*, 32 F.3d at 763 ("The employer satisfies its burden of production [to articulate some legitimate, nondiscriminatory reason for the employee's rejection] by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."); *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 657 (E.D. Pa.

---

has failed to satisfy the fourth prong.  (*Id.*)  Thus, the Court focuses its analysis on the second and third steps of the *McDonnell Douglas* analysis.

2018) (citing *Fuentes*, 32 F.3d at 763) (describing the employer's burden at the second step of the *McDonnell Douglas* framework to be a "relatively light" burden of production).

Second, for purposes of Plaintiff's *race* discrimination claim, whether the County was on notice of Plaintiff's reason for her leave of absence is irrelevant. We are cabined here to Plaintiff's race discrimination claim, and while there appears to be a dispute as to whether Plaintiff explained to Rhoades that she was on medical leave, this is material only to Plaintiff's *disability* discrimination claim, not her *race* discrimination claim. *Cf. Lewis v. CNA Nat'l Warranty Corp.*, 63 F. Supp. 3d 959, 969 (D. Minn. 2014) ("The conclusion that Lewis has produced sufficient evidence for a jury to infer that she was discharged because of her sex and/or age does not dictate that that evidence is susceptible to an inference that she was discharged because of a disability. While the relevance of Lewis' ADHD and anxiety to her sex and age discrimination claims may yet be shown, she has not even attempted to identify evidence from which it could be inferred that she was discharged because of a disability. Therefore, insofar as CNAN seeks summary judgment on Lewis' disability discrimination claim, the motion is granted."); *White v. U.S. Cath. Conf.*, No. CIV.A.97-1253TAF/JMF, 1998 U.S. Dist. LEXIS 11832, at *5 (D.D.C. May 22, 1998) ("[O]nly discrimination or retaliation of the same character and type as that [which] is alleged is probative.").

Last, while not a foregone conclusion that Plaintiff would be unavailable to work consistently and full-time for the County as a correctional officer if she were retained, the County's consideration of Plaintiff's past work history, which included over one year of leave, is reasonable. The record indicates that the County had legitimate concerns regarding whether it would have the staffing needed to maintain the safety of its personnel (*see* Doc. No. 17-9 at 51:18–52:5), and the County's consideration of an applicant's past work history with GEO is

reasonable and relevant to that concern.  Thus, the fact that Plaintiff hypothetically could have been available if retained does not suggest that Defendant's proffered reason is illegitimate.  *See Fuentes*, 32 F.3d at 763 ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."); *cf. id.* (noting that the employer need not "prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff") (emphasis in original).  Thus, the Court finds that the County has successfully articulated a legitimate, nondiscriminatory reason for not offering Plaintiff a position of employment.

### B.  Pretext

Second, the Court agrees with the County that Plaintiff fails to demonstrate any dispute of fact suggesting that the County's stated reason was a pretext for race discrimination.  Plaintiff argues that there are disputes of facts relating to the pretext prong of the *McDonnell Douglas* framework, including (1) disputes concerning whether Mario Colucci was involved in the decision to not offer Plaintiff employment; (2) disputes concerning whether the County's decision to offer employment to three white officers who had also been out on extended leave is evidence of pretext; and (3) disputes regarding whether Warden Williams's failure to take action in response to Plaintiff's complaint of race discrimination on April 5, 2022 is probative of pretext.  (Doc. No. 25 at 8–10.)  The Court addresses each argument in turn.

First, Plaintiff argues that Colucci, who she alleges is a racist individual, may have been involved in the decision not to hire her as a correctional officer.  (*Id.* at 8.)  She argues that although the County's witnesses testified that Colucci had no official role in connection with

Plaintiff's employment application, "Mr. Rhoades testified that he had extensive interactions and was very familiar with Mr. Colucci for many years before GEO hire[d] Mr. Rhoades in 2021. Based on those interactions, Ms. Trainer contends that Mr. Colucci influenced Mr. Rhoades to reverse his stated intention to her to recommend that she be offered employment, and instead recommend that she not be offered employment."  (*Id.* at 8–9.)  Plaintiff's argument is belied by the record and is flagrantly speculative.  Contrary to Plaintiff's unsupported claim, Rhoades specifically testified that Colucci had no involvement in the hiring process and did not have any impact on his decision to not recommend Plaintiff for employment.  (Doc. No. 26-2 at 42:19–19.)  Other witnesses also confirmed that Colucci did not have any involvement in the hiring decision for Plaintiff and did not conduct any interviews.  (*See* Doc. No. 17-9 at 68:19–20 (Warden Williams testifying, "Mr. Colucci did not have any decision making in the hiring determination"); *id.* at 67:17–20 (Warden Williams deposition, "Q: Now, did Mr. Colucci have any input in whether or not you were going to hire Ms. Trainer – or extend an offer of employment to her?  A: No."); Doc. No. 17-6 at 36:20–37:6 (Deputy Warden for Operations and Administration testifying that "[t]o the best of my knowledge, Mario Colucci didn't have any involvement in the interview process"); Doc. No. 17-10 at 39:3–5 (Union Vice President testifying that he was not aware of anyone who was interviewed by Colucci).[11]  Plaintiff's only

---

[11] Although not discussed in Plaintiff's opposition to summary judgment, the Union president's speculative testimony that Colucci played an "integral" role in the hiring determination is insufficient to create a dispute of fact to defeat entry of judgment.  The Union president was unable to provide even a modicum of evidence based on personal knowledge and was merely speculating that Colucci was involved because he was present at the letter disposition meetings.  *See supra* n.6.  *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("We note that an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."); *Huff v. Dresher Hill Health & Rehab. Ctr.*, No. 21-1773, 2023 U.S. Dist. LEXIS 108264, at *22–23 (E.D. Pa. June 22, 2023) (in disability association discrimination case, holding that a witness's deposition testimony was insufficient to avoid entry of summary judgment because "[n]othing in this testimony allows any inference, or even suspicion, that among the reasons Plaintiff was fired, one of them was her association with her son. . . . Plaintiff cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions that Defendant *might* have also terminated her because of her son's disability")

proffered "evidence" that Colucci was involved in her hiring process is her speculation that merely because Rhoades and Colucci were "friendly," Colucci must have convinced Rhoades not to hire her.  (Doc. No. 25 at 8–9.)  However, there is not a shred of evidence in the record to support this assertion, and the Court concludes that there is no dispute of fact suggesting that the County's legitimate, non-discriminatory reason for not hiring Plaintiff was pretextual.[12]  *See Ma v. Westinghouse Elec. Co., LLC*, F. App'x 165, 169–71 (3d Cir. 2014) (holding that the plaintiff failed to establish pretext in a gender/religious discrimination case because "the 'evidence' to which [the plaintiff] points consists of her own conclusory statements and opinions, which are legally insufficient to support an inference of pretext"); *Fitzgerald v. Nat'l R.R. Passenger Corp.*, No. 23-2340, 2024 WL 771711, at *9 (3d Cir. Feb. 26, 2024) ("To establish pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication, or (2) present evidence sufficient to support an inference that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  Fitzgerald, however, relies on only his own speculation and conjecture to demonstrate pretext, which is insufficient to defeat summary judgment.") (citation and quotation omitted); *cf. Rosati*, 94 F. Supp. 3d at 714–15 (holding that the plaintiff failed to show a prima facie case of sex discrimination because "[a] plaintiff cannot

---

(cleaned up); *Rosati*, 94 F. Supp. at 715 (citing *Blunt*, 767 F.3d at 296–97) ("While we view the evidence in the light most favorable to the non-movant, we are not required to take into account evidence that would not be admissible at trial.").

[12] Plaintiff does not discuss this in her opposition brief to the County's motion for summary judgment, but to the extent Plaintiff argues that Colucci was involved in the determination not to hire her because he was in a possession of a "no-hire" list of employees, Plaintiff fails to provide any admissible evidence suggesting that Colucci had a created such a list that was based on racial animus, or otherwise that Colucci was involved in Plaintiff's hiring determination.  *See supra* n.7.

rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment.  Rosati's assertions that she alone received certain extra assignments from Sgt. Colello, and that he specifically assigned them to her because of her sex, are unsupported and conclusory.  Beyond the pleadings, Rosati provides only her deposition testimony to support this claim, and her deposition testimony relies on hearsay -- that is, what other police officers told her their work assignments were") (citations omitted).

Second, Plaintiff argues that that the legitimate reason for not hiring Plaintiff is pretext for race discrimination because the County offered employment positions to three white individuals—John Omelchuk, Zach Serody, and Robert Cullen—who, like Plaintiff, had recently taken extended leaves of absence prior to receiving employment offers from the County.[13]  (Doc. No. 25 at 9.)  But, the undisputed evidence in the record shows that although Warden Williams knew that Plaintiff had been out on leave for approximately 15 months (*see* Doc. No. 17-18 at 1; Doc. No. 17-5 at 41:21–25), she did *not* know the length of the leaves taken by Omelchuk, Serody and Cullen.  (Doc. No. 24-2 at ¶¶ 35, 37, 38; Doc. No. 17-14 at ¶ 5; Doc. No. 17-9 at 73:17–22; 74:4–18; 76:4–9; 76:20–77:8.)  Instead, she testified that she did not have access to GEO's personnel records to determine the length of leave of absence for Omelchuk, Serody, and Cullen, and that she did not learn the length of their leaves of absence during the interview process.  (Doc. No. 17-9 at 31:21–32:6; 73:17–22; 74:4–18; 76:4–9; 76:20–77:8.)  Although Plaintiff argues that Warden Williams testified that she knew at least two of them were on extended leaves due to approved medical or workers compensation claims (Doc. No. 25 at 9), the record indicates the contrary.  Plaintiff's only record citation for this assertion is to Warden

---

[13] Plaintiff argues that "[t]he testimony of Mr. Rhoades and Ms. Williams that they allegedly did not know the reason why Ms. Trainer was out from work merely establishes a dispute as to a genuine issue of material fact."  (*Id.*)  But as discussed above, whether Rhoades and Warden Williams actually knew of the reason for Plaintiff's leave is irrelevant to her *race* discrimination claim.  *See supra* Part III.A.

Williams's deposition (*see id.*),[14] but in the cited record, Warden Williams specifically denied knowledge of the length of each individual's leave.  (*See* Doc. No. 17-9 at 73:17–22 ("A: But your original question was whether or not I was aware if [Robert Cullen] was out on any leave? Q: Yes.  Were you?  A: I was not aware that he was out on any leave."); *id.* at 74:4–76:16 ("Q: you interviewed Mr. [Serody].  Correct?  A: Yes.  [. . .]  Q: Did you know at the time that he had been out for a year or so because of a hand injury.  [Defendant's counsel objects to form.]  A: Worker's Compensation claim.  *I don't know the length of time.*") (emphasis added); *id.* at 76:20–77:8 ("Q: do you recall whether [John Omelchuk] was out on leave for a period of time while he worked for GEO?  A: I believe he was as well.  I don't know the specifics.  Q: You don't know how long he was out?  A: *No.*") (emphasis added).)  Because Warden Williams was unaware of the length of leave for the three white employees, and there is no proper evidence indicating a genuine dispute of fact as to this issue, these three candidates are inapt comparisons to Plaintiff.  This cannot serve as a basis for establishing pretext.

Last, Plaintiff argues that Warden Williams's failure to act after Plaintiff lodged allegations of racial discrimination against Colucci during her April 5, 2022 rejection meeting establishes pretext.  (Doc. No. 25 at 9–10.)  Plaintiff suggests that the County established a mechanism for rejected applicants to seek review of the rejection decision, that Warden Williams had "numerous documents" relating to Plaintiff's complaint that race was a motivating factor in her decision not to continue her employment with the County, and that Warden Williams' failure to investigate Plaintiff's complaint in light of this "evidence" is "probative of whether race discrimination in fact was a motivating factor in the decision to not offer her employment."  (*Id.*)

---

[14] Plaintiff's brief cites to paragraphs 87 and 88 of Plaintiff's Additional Statement of Undisputed Facts, but based on the context of the argument, the Court understands that Plaintiff was likely referring to paragraphs 86 and 87 of the Additional Statement of Undisputed Facts.  (*See* Doc. No. 24-2.)

Plaintiff's confused argument misrepresents the evidence in the record and fails to provide a coherent basis for suggesting that the County's legitimate, non-discriminatory reason for not hiring Plaintiff was pretextual. Any failure of Warden Williams not to pursue Plaintiff's allegations of racism against Colucci raised during the April 5, 2022 meeting (*see* Doc. No. 24-3 at 6–9), is insufficient to establish that the County's reason for not hiring Plaintiff was pretextual. The evidence shows that Warden Williams had personal knowledge that Colucci was not involved in Plaintiff's hiring determination, which was made prior to any accusations of racism. (*See* Doc. No. 17-9 at 68:15–22 ("Q: So once you received that information, did you do any kind of investigation to determine whether or not there was any truth or validity to what Ms. Trainer alleged? A: Well, Mr. Colucci did not have any decision making in the hiring determination. And in terms of the allegations of Mr. Colucci being racist, I had no --- no other evidence to substantiate that. [. . . .] Q: So would it be correct to say that if Mr. Colucci, in fact, was a racist, that had no impact on your decision to either hire --- offer an employment to Ms. Trainer or to change your recommendation not to offer employment? A: The decision to offer employment had already been made or not to offer. His allegations of being racist was a separate issue.").) Plaintiff's speculation that Colucci was racist and must have been involved in the decision of the County not to hire her cannot manufacture a dispute of fact.

Therefore, the Court holds that Plaintiff has failed to demonstrate any dispute of fact that would permit a reasonable jury to determine that the County's legitimate, non-discriminatory reason for denying Plaintiff's employment application was pretextual of race discrimination.[15]

---

[15] The overall employment statistics for employees hired at the Facility further bely Plaintiff's argument that the County's legitimate, nondiscriminatory reason for not employing Plaintiff was pretextual. Plaintiff admits that nearly 85% of correctional officers hired at the Facility self-identified as Black, and over 80% of all correctional officers, lieutenants and sergeants who disclosed their race did the same. (Doc. No. 17-23; Doc. No. 24-2 at ¶ 27.) The Court concludes that this additional evidence also refutes Plaintiff's suggestion of pretext.

**IV. Conclusion**

For the reasons set forth above, the County's partial motion for summary judgment is granted.  An appropriate Order follows.